FILED

2013 NOV 22  PM 3: 10

CLERK US DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

BY_____ DEPUTY

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

February 2012 Grand Jury

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>           Plaintiff,<br><br>     v.<br><br>KOORUSH TAHERKHANI (1),<br>     aka Koorush Taher Khani,<br>TIG MARINE<br>     ENGINEERING SERVICES   (2),<br>ERGUN YILDIZ (3),<br>ARASH GHAHREMAN (4),<br><br>           Defendants. | Case No. '13 CR 4228 DMS<br><br>I N D I C T M E N T<br><br>Title 50, U.S.C., Secs. 1702 and 1705, and Title 31, C.F.R., Part 560 - Conspiracy to Export to Embargoed Country; Title 18, U.S.C., Secs. 554 and 371 - Conspiracy to Smuggle Goods from the United States; Title 50, U.S.C., Secs. 1702 and 1705, and Title 31, C.F.R., Part 560.203 and 560.204 - Attempted Export to Embargoed Country; Title 18, U.S.C., Sec. 554 - Smuggling of Goods from the United States; Title 18, U.S.C., Secs. 1956(h) and 1956(a)(2)(A) - Conspiracy to Launder Monetary Instruments; Title 18, U.S.C., Sec. 1956(a)(2)(A) - Laundering of Monetary Instruments; Title 18, U.S.C., Sec. 2 - Aiding and Abetting; Title 18, U.S.C., Secs. 981(a)(1)(C) and 982(a)(1), and Title 28, U.S.C., Sec. 2461(c) - Criminal Forfeiture |

The grand jury charges:

INTRODUCTORY ALLEGATIONS

1.   Defendant TIG MARINE ENGINEERING SERVICES ("TIG MARINE") was a company established in Dubai, United Arab Emirates ("U.A.E."), that brokered goods, services and technology for foreign customers, to

SPH:lml:San Diego
11/22/13

1  include acquisition and exportation of U.S. goods and technology for
2  export to, and end-use in, the Islamic Republic of Iran ("Iran").

3      2.    Defendant KOORUSH TAHERKHANI, aka Koorush Taher Khani
4  ("TAHERKHANI") was a citizen and resident of Iran and the founder and
5  director of TIG MARINE, who used TIG MARINE as a "front company" for
6  the illegal acquisition and exportation of U.S. goods and technology
7  for export to, and end-use, in Iran.

8      3.    Defendant ERGUN YILDIZ ("YILDIZ") was a citizen of Germany,
9  residing in Dubai, U.A.E., and the President of TIG MARINE.

10     4.    Defendant ARASH GHAHREMAN ("GHAHREMAN") was a citizen of the
11  United States, residing in New York, who acted as an agent of TIG
12  MARINE, TAHERKHANI and YILDIZ, in their efforts to acquire U.S. goods
13  and technology for illegal export from the United States.

14     5.    Defendants TAHERKHANI, TIG MARINE, YILDIZ, and GHAHREMAN,
15  with the assistance of other individuals, were attempting to acquire
16  the U.S. goods and technology, including the following marine
17  navigation equipment and military electronic equipment, for
18  exportation to, and end-use in, Iran:

19         a.    The NAVIGAT 2100 Fiber-Optic Gyrocompass and Attitude
20  Reference System ("NAVIGAT 2100"), was manufactured by Northrop
21  Grumman Sperry Marine which was located in Charlottesville, Virginia.
22  The NAVIGAT 2100 was used in maritime navigation applications in
23  strapdown technology for integrated bridges and advanced high speed
24  vessels.

25  //
26  //
27  //

28                                    2

1      b.    The Planar Triode Y-690 ("Y-690"), was manufactured by

2  Communications and Power Industries ("CPI") which was located in Palo

3  Alto, California.   The Y-690 was an electron tube used in military

4  airborne radar and transponder applications.

The Iran Trade Embargo

6      6.    The International Emergency Economic Powers Act ("IEEPA"),

7  Title 50, United States Code, Sections 1701-1706, authorized the

8  President of the United States ("the President") to impose economic

9  sanctions on a foreign country in response to an unusual or

10 extraordinary threat to the national security, foreign policy or

11 economy of the United States when the President declared a national

12 emergency with respect to that threat.

13     7.    On March 15, 1995, the President issued Executive Order

14 No. 12957, finding that "the actions and policies of the Government of

15 Iran constitute an unusual and extraordinary threat to the national

16 security, foreign policy, and economy of the United States" and

17 declaring "a national emergency to deal with that threat."  Executive

18 Order No. 12957, as expanded and continued by Executive Orders 12959

19 and 13059, was in effect at all times relevant to this Indictment.

20     8.    Executive Orders 12959 and 13059 (collectively, with

21 Executive Order No. 12957, "Executive Orders"), imposed economic

22 sanctions, including a trade embargo, on Iran.   The Executive Orders

23 prohibited, among other things, the exportation, reexportation, sale,

24 or supply, directly or indirectly, to Iran or the Government of Iran,

25 of goods, technology, or services from the United States.

26 //

27 //

28

1      9.   Pursuant to the Executive Orders, the United States Secretary of the Treasury promulgated the Iranian Transactions and Sanctions Regulations, 31 C.F.R. Part 560, implementing the sanctions imposed by the Executive Orders. Section 560.203 of the Iranian Transactions and Sanctions Regulations prohibited any transaction that evaded or avoided, or had the purpose of evading or avoiding, any of the other Iranian Transactions and Sanctions Regulations. Section 560.204 prohibited the unauthorized exportation, reexportation, sale or supply, directly or indirectly, from the United States of goods, technology, or services to Iran or the Government of Iran.

      10.   The Department of Treasury's Office of Foreign Assets Control administered the authorization and issuance of licenses for any exports subject to the Iranian Transactions and Sanctions Regulations. With very limited exceptions, in the absence of a license, or other prior approval, it was illegal under IEEPA and the Iranian Transactions and Sanctions Regulations to export products or services to Iran or the Government of Iran, or to export the products or services to a third country if the export was intended or destined for Iran or the Government of Iran.

      11.   At all times relevant to this Indictment, defendants TAHERKHANI, TIG MARINE, YILDIZ and GHAHREMAN did not apply for, receive, or possess a license or authorization from the Office of Foreign Assets Control to export any marine navigation equipment or military electronic equipment, or related parts, components, or technology to Iran.

//

4

## Count 1

### CONSPIRACY TO EXPORT TO EMBARGOED COUNTRY

12.   Beginning at a date unknown and continuing to on or about June 17, 2013, within the Southern District of California, and elsewhere, defendants KOORUSH TAHERKHANI, aka Koorush Taher Khani, TIG MARINE ENGINEERING SERVICES, ERGUN YILDIZ, and ARASH GHAHREMAN, did knowingly and willfully agree and conspire with each other, and with other persons known and unknown to the grand jury, to:

      a.   export, sell and supply marine navigation equipment and military electronic equipment, directly and indirectly from the United States to Iran and the Government of Iran in violation of the embargo imposed upon that country by the United States, without having first obtained the required licenses and authorizations from the Office of Foreign Assets Control, United States Department of the Treasury, in violation of Title 31, Code of Federal Regulations, Part 560.204; and

      b.   engage in transactions within the United States that evade and avoid, and have the purpose of evading and avoiding, the prohibition against exporting, selling and supplying, marine navigation equipment and military electronic equipment, directly and indirectly, from the United States to Iran and the Government of Iran without having first obtained the required licenses and authorizations from the Office of Foreign Assets Control, United States Department of Treasury, in

violation of Title 31, Code of Federal Regulations, Part 560.203.

### Method and Means of the Conspiracy

13. The methods and means by which the defendants sought to accomplish the objects of the conspiracy included, among others, the following:

      a.   Defendants KOORUSH TAHERKHANI, aka Koorush Taher Khani ("TAHERKHANI"), TIG MARINE ENGINEERING SERVICES ("TIG MARINE"), and ERGUN YILDIZ ("YILDIZ") would receive purchase orders and requests from co-conspirators and customers in Iran for U.S. origin goods and technology.

      b.   Defendants TAHERKHANI, TIG MARINE, and YILDIZ, with the assistance of defendant ARASH GHAHREMAN ("GHAHREMAN"), would purchase from suppliers located in the United States ("the U.S. suppliers") the goods and technology sought by the co-conspirators and customers in Iran.

      c.   In order to obtain the goods and technology from U.S. suppliers and evade the prohibition against exporting or transhipping goods and technology to Iran, defendants TAHERKHANI and YILDIZ used defendant TIG MARINE, a company located in Dubai, United Arab Emirates, as a "front company" for the purchase of goods and technology sought by their co-conspirators and customers in Iran.

      d.   In order obtain the goods and technology from U.S. suppliers and evade the prohibition against exporting or transhipping goods and technology to Iran, defendant

1    TAHERKHANI, an Iranian national, directed defendant
2    YILDIZ, a German national, to act as the president of
3    Defendant TIG MARINE.

4    e.  In order obtain the goods and technology from U.S.
5        suppliers and evade the prohibition against exporting
6        or transhipping goods and technology to Iran, defendant
7        GHAHREMAN, a U.S. citizen and resident, acted as the
8        agent and primary negotiator for defendants TAHERKHANI,
9        TIG MARINE, and YILDIZ in the purchase of said goods
10       and technology sought by their co-conspirators and
11       customers in Iran.

12   f.  Defendants TAHERKHANI, YILDIZ and GHAHREMAN would use
13       various email accounts to communicate with suppliers of
14       U.S. goods and technology.

15   g.  In order to obtain U.S. goods and technology from U.S.
16       suppliers and evade U.S. export controls, defendants
17       TAHERKHANI, TIG MARINE, YILDIZ, and GHAHREMAN would
18       knowingly and intentionally conceal from suppliers that
19       the goods and technology were intended for, and would
20       be delivered to, Iran or the Government of Iran.

21   h.  In order obtain the goods and technology from U.S.
22       suppliers and evade U.S. export controls, defendants
23       TAHERKHANI, TIG MARINE, YILDIZ, and GHAHREMAN would
24       induce and instruct individuals and companies within
25       the U.S. to knowingly or unwittingly provide false end
26       user information to U.S. suppliers and manufacturers.

27   //

28                                7

i.  In order to obtain U.S. goods and technology from suppliers and evade U.S. export controls, defendants TAHERKHANI, TIG MARINE, YILDIZ, and GHAHREMAN would induce and instruct individuals and companies within the United States to conceal the exportation of U.S. goods and technology to Iran, by various means, including, shipping or smuggling the goods to a third country for transhipment to Iran.

j.  Defendants TAHERKHANI, TIG MARINE, YILDIZ and GHAHREMAN would cause funds to be transported from a place outside the United States to a place in the United States to promote the acquisition and illicit exportation of U.S. goods and technology to Iran, by various means, including the wire transfer of funds from a third country to U.S. bank accounts.

## Overt Acts

14.  In furtherance of the conspiracy and to effect the objects thereof, the following overt acts, among others, were committed within the Southern District of California, and elsewhere:

## NAVIGAT 2100s to Iran

a.  On or about December 16, 2012, defendant TAHERKHANI sent an email to defendant GHAHREMAN in the U.S. in which he requested that GHAHREMAN obtain price quotes from U.S. suppliers for four (4) to six (6) sets of the NAVIGAT 2100.

b. On or about December 18, 2012, defendant GHAHREMAN sent an email to defendant TAHERKHANI in which he informed TAHERKHANI that he had contacted a U.S. supplier of the NAVIGAT 2100s and learned that the transaction was a "very sensitive sale" which might require notification to the U.S. Department of Homeland Security and would require TAHERKHANI to provide end user information including the country of destination.

c. On or about December 18, 2012, at the direction of defendants TAHERKHANI and YILDIZ, defendant GHAHREMAN provided a U.S. supplier with end use information relating to the purchase of six (6) NAVIGAT 2100s, in which he identified the customer as defendant TIG MARINE of Dubai, U.A.E., for end use in a marine vessel owned by a shipping company in Dubai.

d. On or about December 19, 2012, defendant GHAHREMAN sent defendant TAHERKHANI an email in which he informed TAHERKHANI that the U.S. supplier had rejected the sale of the NAVIGAT 2100 because the U.S. manufacturer deemed the transaction suspicious (i.e., "The decision was based on a review of the company, their associations, etc.  Also the end use of the [NAVIGAT 2100] on board such a small vessel [is] suspect.  It would be like putting a Mercedes Engine in a tricycle, in their words.")

e. In a reply email to defendant GHAHREMAN of on or about December 19, 2012, defendant TAHERKHANI questioned why

the U.S. supplier had contacted the U.S. manufacturer and explained to GHAHREMAN that this was the reason he had asked GHAHREMAN to only contact distributors who had the NAVIGAT 2100s available in stock.

f.   On or about December 21, 2012, defendant GHAHREMAN sent an email to a Homeland Security Investigations undercover agent, who was posing as a broker of U.S. goods and technology ("the San Diego supplier"), and informed the San Diego supplier that he had a "friend in Dubai, U.A.E." who needed six (6) NAVIGAT 2100s.

g.   On or about December 21, 2012, defendant GHAHREMAN spoke by telephone with the San Diego supplier, and informed the San Diego supplier of his previous unsuccessful attempt to obtain the NAVIGAT 2100 from another U.S. supplier.

h.   On or about December 27, 2012, at the direction of defendant TAHERKHANI, defendant GHAHREMAN sent an email to the San Diego supplier in which GHAHREMAN requested a price quotation for the purchase of four (4) NAVIGAT 2100s.

i.   On or about January 3, 2013, defendant GHAHREMAN spoke by telephone with the San Diego supplier and informed the San Diego supplier that the customer for the NAVIGAT 2100 ultimately wanted to purchase 100 units of the NAVIGAT 2100, but GHAHREMAN acknowledged that such a large transaction was risky because the U.S. manufacturer of the NAVIGAT 2100 would assume that the

1     end user of such a large purchase order was a foreign
2     government.

3   j.   In an email of on or about January 3, 2013, defendant
4     GHAHREMAN forwarded to defendant TAHERKHANI a price
5     quotation of $284,000 for four (4) NAVIGAT 2100s which
6     he had received from the San Diego supplier, and
7     informed TAHERKHANI that he should add a commission of
8     $20,000 to be paid to GHAHREMAN.

9   k.   On or about January 3, 2013, defendant TAHERKHANI, sent
10     an email to defendant GHAHREMAN, in the U.S., in which
11     he instructed GHAHREMAN to proceed with the purchase of
12     the NAVIGAT 2100s from the San Diego supplier.

13   l.   On or about January 4, 2013, defendant GHAHREMAN spoke
14     by telephone with the San Diego supplier, and during
15     that telephone conversation, GHAHREMAN acknowledged
16     that due to GHAHREMAN's previous failed attempts to
17     obtain the NAVIGAT 2100s, the San Diego supplier would
18     have to order the NAVIGAT 2100s by providing false end
19     user information to the U.S. manufacturer.

20   m.   On or about January 4, 2013, defendant TAHERKHANI sent
21     an email to defendant GHAHREMAN in which he forwarded a
22     contract signed by defendant YILDIZ on behalf of
23     defendant TIG MARINE, which contract authorized
24     GHAHREMAN to act as a representative of TIG MARINE in
25     the acquisition of U.S. goods and technology, including
26     the purchase of six (6) NAVIGAT 2100s.

27  //

28

n.   In an email of on about January 4, 2013, defendant GHAHREMAN forwarded defendant TAHERKHANI a price quotation and sales contract for six (6) NAVIGAT 2100s received from the San Diego supplier, which required a ten percent down payment approximately ten days after acceptance of the contract, and subsequent installment payments via wire transfer to an escrow account with a Standby Letter of Credit bank guarantee.

o.   On or about January 8, 2013, defendant TAHERKHANI, in Iran, sent an email to defendant GHAHREMAN in the U.S., in which TAHERKHANI informed GHAHREMAN that the terms of the sales contract for the NAVIGAT 2100s provided by the San Diego supplier were acceptable to him.

p.   On or about January 31, 2013, defendant GHAHREMAN sent an email to the San Diego supplier, which included as an attachment, a signed copy of the sales contract for the NAVIGAT 2100s bearing the signature of GHAHREMAN and defendant TAHERKHANI, as the "directing manager" of defendant TIG MARINE.

q.   On or about February 14, 2013, defendant GHAHREMAN spoke by telephone with the San Diego supplier, and during that conversation, GHAHREMAN stated that defendants TAHERKHANI and TIG MARINE wanted to change the terms of the sales contract to purchase four (4) units of the NAVIGAT 2100, instead of six (6) units.

r.   On or about February 19, 2013, defendant TAHERKHANI sent an email to the San Diego supplier in which he

attached a funds transfer receipt from a bank in Dubai showing a wire transfer to the San Diego suppliers bank account in the amount of $10,000, which sum represented a partial payment of the ten percent down payment due under the sales contract for the four (4) NAVIGAT 2100s.

s. On or about February 20, 2013, defendant TAHERKHANI caused approximately $10,000 to be wired from a bank in Dubai, U.A.E., to the San Diego supplier's bank account in San Diego, California.

t. On or about March 6, 2013, defendant GHAHREMAN sent an email to the San Diego supplier in which he attached a funds transfer receipt from a bank in Dubai, U.A.E., showing a wire transfer to the San Diego supplier's bank account in the amount of $18,000 representing the remainder of the ten percent down payment for the four (4) NAVIGAT 2100s.

u. On or about March 6, 2013, defendant TAHERKHANI caused approximately $18,000 to be wired from a bank in Dubai, U.A.E., to the San Diego supplier's bank account in San Diego, California.

v. On or about March 20, 2013, defendant GHAHREMAN sent an email to the San Diego supplier in which GHAHREMAN accepted an invitation by the San Diego supplier for defendants TAHERKHANI and GHAHREMAN to meet with the San Diego supplier at his company retreat in Las Vegas, Nevada.

13

w.  On or about April 4, 2013, in preparation for a trip to Las Vegas, Nevada, defendant GHAHREMAN sent an email to the San Diego supplier which included a request from defendant TAHERKHANI that the San Diego supplier change TAHERKHANI's title in the letter of invitation to the U.S. from "directing manager" of defendant TIG MARINE to "business development manager" or "owner" because due to TAHERKHANI's Iranian nationality and for "smooth operation" of his company TAHERKHANI had listed a "German guy" (defendant YILDIZ) as the manager on TIG MARINE's license to do business in the U.A.E.

x.  On or about May 2, 2013, defendant TAHERKHANI sent the San Diego supplier an email, in which TAHERKHANI stated that he had not provided further installment payments for the NAVIGAT 2100s as required by the sales contract because he was experiencing delays with his bank in obtaining a Standby Letter of Credit, but that he still wanted the NAVIGAT 2100s.

y.  On or about May 2, 2013, defendant GHAHREMAN had a telephone conversation with the San Diego supplier, in which he informed the San Diego supplier that defendant TAHERKHANI no longer planned to travel to the U.S. to meet with the supplier for fear of being arrested, stating TAHERKHANI "would love to come you know, [but] if you see the news .... politic things that ... happen, not business things ... Somebody want to

14

purchase something from the United States go to jail or something."

z.   On or about May 3, 2013, defendant GHAHREMAN spoke with the San Diego supplier by telephone, and during that conversation, defendant GHAHREMAN rejected the supplier's proposal that defendant TAHERKHANI use defendant GHAHREMAN's U.S. bank account to wire transfer the installment payments to the supplier because he did not want to be associated with exporting the NAVIGAT 2100s, i.e., "I don't want to be working as an exporter in this matter, ... you [the San Diego supplier] will be the role of exporter."

aa.  On or about before May 12, 2013, defendant YILDIZ sent an email to a Dubai bank in which he attached a form Standby Letter of Credit (SLOC) previously provided by the San Diego supplier's financial assistant for the NAVIGAT 2100 down payments, and requested that a bank employee review the SLOC from his "supplier which he wants to give me to assure my down payment" and "check it if we can deal like this."

bb.  On or about May 16, 2013, defendant GHAHREMAN had a telephone conversation with the San Diego supplier, in which GHAHREMAN acknowledged that the San Diego supplier and GHAHREMAN were taking all the risks with the export laws by providing false end user information to the U.S. manufacturer of the NAVIGAT 2100.

//

cc.   On or about May 17, 2013, defendant GHAHREMAN spoke by telephone with the San Diego supplier, and during that conversation, GHAHREMAN stated that defendant YILDIZ, the president of defendant TIG MARINE, and GHAHREMAN would attend the meeting with the San Diego supplier in Las Vegas the week of June 10, 2013.

dd.   On or about May 17, 2013, in preparation for the U.S. meeting with defendant YILDIZ, defendant TAHERKHANI sent an email to the San Diego supplier in which he provided a copy of YILDIZ's German passport.

ee.   On or about May 25, 2013, defendant GHAHREMAN forwarded an email to the San Diego supplier from defendant TAHERKHANI, in which TAHERKHANI stated that he was only willing to complete the purchase of the NAVIGAT 2100s if the sales contract was modified to provide more guarantees, that is, to allow the buyer, defendant TIG Marine, to issue a Sight Letter of Credit, payable by the buyer's bank upon sight of necessary complying documents showing the actual shipment of the NAVIGAT 2100s by the San Diego supplier.

ff.   On or about May 28, 2013, defendant GHAHREMAN spoke by telephone with the San Diego supplier, and during that conversation defendant GHAHREMAN attempted to allay the supplier's stated concern that they were at risk of going to jail because the NAVIGAT 2100s were ultimately going to Iran, by stating "I never ask [defendant TAHERKHANI] even (if) I suspect or I guess or

16

something, I never ask him ... if you sell something in this country to me today, and ... six months later, (it) is ... going to Africa, Sudan, or some civil war country or something over there, ... this is not your fault .... [TAHERKHANI] also provide the end user, ... and if he knows that is going to own country, or something, his problem, and ... he should answer to UAE not here, and is going to jail over there, not here."

gg. On or about May 30, 2013, defendants TAHERKHANI and GHAHREMAN spoke with the San Diego supplier by telephone, and during that telephone conversation, TAHERKHANI and GHAHREMAN agreed that GHAHREMAN and defendant YILDIZ would meet with the San Diego supplier in Las Vegas, Nevada, the week of June 10, 2013, for the purpose of viewing one (1) NAVIGAT 2100.

hh. On or about May 30, 2013, defendants TAHERKHANI and GHAHREMAN spoke with the San Diego supplier by telephone, and during that telephone conversation, TAHERKHANI and GHAHREMAN agreed that after GHAHREMAN and YILDIZ viewed the NAVIGAT 2100 in Las Vegas, and witnessed the shipping of the item to defendant TIG MARINE in Dubai, TAHERKHANI would make an additional installment payment of approximately $28,500.

ii. On June 1, 2013, defendant YILDIZ sent the San Diego supplier an email in which he agreed that after he inspected the one unit of the NAVIGAT 2100 in Las Vega, Nevada, an additional installment payment would be made

1  to the San Diego supplier's bank account, via wire
2  transfer.

3  Y-690 Transaction

4  jj.  On or about January 2, 2013, defendant TAHERKHANI sent
5  an email to defendant GHAHREMAN, in which he asked
6  GHAHREMAN if he could obtain several U.S. manufactured
7  military electronic parts, including the Y-690.

8  kk.  On or about January 2, 2013, defendant GHAHREMAN sent
9  the San Diego supplier an email in which GHAHREMAN
10  requested a price quotation for the military electronic
11  parts requested by defendant TAHERKHANI.

12  ll.  After defendant GHAHREMAN received a proforma invoice
13  for 50 units of the Y-690 from the San Diego supplier,
14  on or about January 15 2013, GHAHREMAN sent an email to
15  the San Diego supplier in which he requested a data
16  sheet and product specifications for the Y-690 "to
17  finalize the deal and contract with the customer."

18  mm.  On or about January 16, 2013, an Iranian customer of
19  defendant TAHERKHANI ("the Iranian customer") sent an
20  email to TAHERKHANI in which he thanked TAHERKHANI for
21  the "EMAIL Data sheet (Y-690 tube)" and requested a
22  proforma invoice and delivery time for 100 units of the
23  Y-690.

24  nn.  On or about February 21, 2013, defendant GHAHREMAN sent
25  an email to the San Diego supplier, in which GHAHREMAN
26  requested that the San Diego supplier provide a revised

1    sale contract for the purchase of 100 units of the

2    Y-690.

3    oo.   On or about February 27, 2013, the Iranian customer

4          sent defendant TAHERKHANI a request for a quote from

5          the Iranian customer's company, located in Tehran,

6          Iran, for various military electronic parts including

7          100 units of the Y-690.

8    pp.   On or about February 21, 2013, defendant GHAHREMAN

9          spoke with the San Diego supplier by telephone, and

10         during that conversation acknowledged that a U.S.

11         export license was required to export the Y-690 to any

12         location outside the U.S. and requested that the San

13         Diego supplier provide false end user information to

14         the manufacturer and U.S. export licensing agency

15         regarding the sale of the Y-690, i.e., "I am sure that

16         we [GHAHREMAN and defendant TAHERKHANI] do not want to

17         release the end user name."

18   qq.   After receiving a revised sales contract from the San

19         Diego supplier for the purchase of 50 units of the

20         Y-690, on or about March 10, 2013, defendant GHAHREMAN

21         sent the San Diego supplier an email in which he

22         accepted the contract on behalf of defendants TIG

23         MARINE and TAHERKHANI, stating "please consider the

24         contract signed."

25   rr.   On or about March 26, 2013, defendant GHAHREMAN sent an

26         email to the San Diego supplier, in which he attached a

contract for the purchase of 50 units of the Y-690, signed by GHAHREMAN on behalf of defendant TIG MARINE.

ss. On or about May 12, 2013, defendant GHAHREMAN sent the San Diego supplier an email in which he requested that the San Diego supplier place an order for 50 units of the Y-690 with the U.S. manufacturer.

tt. On or about May 13, 2013, defendant GHAHREMAN spoke by telephone with the San Diego supplier, and during that conversation GHAHREMAN acknowledged that the supplier was selling the Y-690 to defendants TAHERKHANI and TIG MARINE without the proper U.S. export license.

uu. On or about May 13 2013, defendant GHAHREMAN spoke by telephone with the San Diego supplier, and during that conversation, GHAHREMAN acknowledge that defendants TIG MARINE and TAHERKHANI needed to wire transfer a ten percent down payment (approximately $10,000) for the Y-690, with subsequent installment payments due via wire transfer into an escrow account with a Standby Letter of Credit bank guarantee.

vv. On or about May 17, 2013, defendant GHAHREMAN spoke by telephone with the San Diego supplier, and during that conversation, GHAHREMAN acknowledged that because the Y-690 was subject to export restrictions neither he nor defendant TAHERKHANI should have direct contact with the U.S. manufacturer of the Y-690.

ww. On or about May 20, 2013, defendant GHAHREMAN spoke by telephone with the San Diego supplier, and during the

20

conversation, GHAHREMAN acknowledged that the Y-690 required a U.S. export license because it was designed for military use in electronic warfare, and that they risked going to jail because they did not have the proper export license to sell the Y-690 to defendants TIG MARINE and TAHERKHANI.

xx.  On or about May 30, 2013, defendants TAHERKHANI and GHAHREMAN spoke by telephone with the San Diego supplier, and during that telephone conversation, TAHERKHANI and GHAHREMAN agreed that GHAHREMAN and defendant YILDIZ would meet with the San Diego supplier in Las Vegas, Nevada, the week of June 10, 2013, for the purpose of making partial payment and accepting partial delivery of at least two units of the Y-690.

Viewing, Payment, and Shipment
of NAVIGAT 2100 and Y-690s

yy.  On or about June 12, 2013, GHAHREMAN traveled by airplane from Newark Airport, New Jersey, to Las Vegas, Nevada, to meet with the San Diego supplier.

zz.  On or about June 12, 2013, defendant YILDIZ traveled by airplane from Dubai, U.A.E., via Los Angeles, California, to Las Vegas to meet with the San Diego supplier.

aaa. On or about June 12, 2013, defendant GHAHREMAN met with the the San Diego supplier at a restaurant, in Las Vegas, Nevada, and during that meeting, GHAHREMAN stated that he did not have any export licenses for the NAVIGAT 2100 or the Y-690s and that the end use in Iran

21

1    for the NAVIGAT 2100 was a ferry ship and the end use
2    in Iran for the Y-690 was an airport.

3    bbb.  On or about June 13, 2013, defendants YILDIZ and
4    GHAHREMAN met with San Diego supplier and his
5    supervisor at a hotel near Las Vegas, Nevada, and
6    during that meeting, YILDIZ and GHAHREMAN viewed and
7    photographed the NAVIGAT 2100 and two (2) Y-690s, and
8    indicated that the items were satisfactory to them.

9    ccc.  During the June 13, 2013, meeting with the San Diego
10   supplier and his supervisor at the hotel near Las
11   Vegas, Nevada, defendants YILDIZ and GHAHREMAN
12   discussed the NAVIGAT 2100 and Y-690 transactions as
13   well as future transactions involving U.S. goods
14   destined for Iran, including: the use of false end user
15   statements to acquire the U.S. goods; means and methods
16   to avoid the Iranian trade sanctions and detection by
17   U.S. Customs officials; the risks of going to jail for
18   their illegal business transactions; and the end users
19   in Iran for the NAVIGAT 2100s and the Y-690s.

20   ddd.  On or about June 13, 2013, after he had viewed and
21   photographed the NAVIGAT 2100, defendant YILDIZ had a
22   telephone conversation with defendant TAHERKHANI, in
23   which he informed TAHERKHANI that they had a "good
24   strategy" to ship the NAVIGAT 2100 and Y-690s out of
25   the U.S., and confirmed that TAHERKHANI would wire a
26   payment of $32,590 to the San Diego supplier's bank
27   account.

28

eee. On or about June 14, 2013, defendants YILDIZ and GHAHREMAN spoke with the San Diego supplier by telephone regarding problems in timely confirming the wire transfer payment by defendant TAHERKHANI, and agreed to travel to San Diego, California, to complete the transaction for the NAVIGAT 2100 and the two (2) Y-690s.

fff. On or about June 17, 2013, defendant TAHERKHANI caused approximately $32,590 to be wired from a bank in Dubai, U.A.E., to the San Diego supplier's bank account in San Diego, California, which monies represented a partial payment for the NAVIGAT 2100 and full payment for the two (2) Y-690s.

ggg. On or about June 17, 2013, in San Diego, California, defendants YILDIZ and TAHERKHANI accepted delivery of the NAVIGAT 2100 and the two (2) Y-690s.

hhh. On or about June 17, 2013, at a commercial carrier facility in San Diego, California, in order to transship the NAVIGAT 2100 and the two (2) Y-690s to Iran, defendants YILDIZ and TAHERKHANI provided the NAVIGAT 2100 and the two (2) Y-690s to a commercial carrier for shipment from the U.S. to third countries.

All in violation of Title 50, United States Code, Sections 1702 and 1705.

//

//

//

Count 2

CONSPIRACY TO SMUGGLE GOODS FROM THE UNITED STATES

15. The allegations in Paragraphs 13 and 14 are incorporated and re-alleged by reference in this Count.

16. Beginning at a date unknown to the grand jury, and continuing to in or about June 17, 2013, within the Southern District of California, and elsewhere, defendants KOORUSH TAHERKHANI, aka Koorush Taher Khani, TIG MARINE ENGINEERING SERVICES, ERGUN YILDIZ, and ARASH GHAHREMAN did knowingly and intentionally agree and conspire with each other and with other persons known and unknown to the grand jury, to commit offenses against the United States, that is, knowingly receive, buy, and facilitate the transportation and sale of merchandise, articles and objects, to wit, marine navigation equipment and military electronic equipment, prior to exportation, knowing the same to be intended for exportation from the United States contrary to law and regulation of the United States, to wit, Title 50, United States Code, Sections 1702 and 1705 (the International Emergency Economics Powers Act ("IEEPA")), and Title 31, Code of Federal Regulations, Part 560 (the Iranian Transactions and Sanctions Regulations); in violation of Title 18, United States Code, Section 554 and Title 18, United States Code, Section 371.

//
//
//
//
//
//

## Count 3

### ATTEMPTED EXPORT TO EMBARGOED COUNTRY

17. On or about June 17, 2013, within the Southern District of California, and elsewhere, defendants KOORUSH TAHERKHANI, aka Koorush Taher Khani, TIG MARINE ENGINEERING SERVICES, ERGUN YILDIZ, and ARASH GHAHREMAN did knowingly and willfully attempt to export, sell, and supply, and cause the exportation, sale, and supply, indirectly, of marine navigation equipment, to wit, a NAVIGAT 2100 Fiber Optic Gyrocompass and Attitude Reference System, from the United States to Iran and the Government of Iran, via the United Arab Emirates, without having first obtained the required authorizations from the Office of Foreign Assets Control, United States Department of the Treasury; in violation of Title 50, United States Code, Sections 1702 and 1705, and Title 31, Code of Federal Regulations, Parts 560.203 and 560.204, and Title 18, United States Code, Section 2.

## Count 4

### ATTEMPTED EXPORT TO EMBARGOED COUNTRY

18. On or about June 17, 2013, within the Southern District of California, and elsewhere, defendants KOORUSH TAHERKHANI, aka Koorush Taher Khani, TIG MARINE ENGINEERING SERVICES, ERGUN YILDIZ, and ARASH GHAHREMAN did knowingly and willfully attempt to export, sell, and supply, and cause the exportation, sale, and supply, indirectly, of military electronic equipment, to wit, two (2) units of the Planar Triode Y-690, from the United States to Iran and the Government of

Iran, via the Czech Republic and the United Arab Emirates, without having first obtained the required authorizations from the Office of Foreign Assets Control, United States Department of the Treasury; in violation of Title 50, United States Code, Sections 1702 and 1705, and Title 31, Code of Federal Regulations, Parts 560.203 and 560.204, and Title 18, United States Code, Section 2.

Counts 5

SMUGGLING OF GOODS FROM THE UNITED STATES

19. Beginning on or about February 19, 2013, and continuing to on or about June 17, 2013, within the Southern District of California, and elsewhere, defendants KOORUSH TAHERKHANI, aka Koorush Taher Khani, TIG MARINE ENGINEERING SERVICES, ERGUN YILDIZ, and ARASH GHAHREMAN did knowingly receive, buy, and facilitate the transportation and sale of merchandise, articles and objects, to wit, a NAVIGAT 2100 Fiber Optic Gyrocompass and Attitude Reference System, prior to exportation, knowing the same to be intended for exportation from the United States contrary to law and regulation of the United States, to wit, that is, without having first obtained the required authorizations from the Office of Foreign Assets Control, United States Department of the Treasury, in violation of Title 50, United States Code, Sections 1702 and 1705 (IEEPA), and Title 31, Code of Federal Regulations, Parts 560.203 and 560.204 (the Iranian Transactions and Sanctions Regulations); all in violation of Title 18, United States Code, Sections 554 and 2.

//

//

1

Count 6

2

SMUGGLING GOODS FROM THE UNITED STATES

3     20.   Beginning on or about March 10, 2013, and continuing to on

4   or about June 17, 2013, within the Southern District of California,

5   and elsewhere, defendants KOORUSH TAHERKHANI, aka Koorush Taher Khani,

6   TIG MARINE ENGINEERING SERVICES, ERGUN YILDIZ, and ARASH GHAHREMAN did

7   knowingly receive, buy, and facilitate the transportation and sale of

8   merchandise, articles and objects, to wit,   two (2) units of the

9   Planar Triode Y-690, prior to exportation, knowing the same to be

10   intended for exportation from the United States contrary to law and

11   regulation of the United States, to wit, that is, without having first

12   obtained the required authorizations from the Office of Foreign Assets

13   Control, United States Department of the Treasury, in violation of

14   Title 50, United States Code, Sections 1702 and 1705 (IEEPA), and

15   Title 31, Code of Federal Regulations, Parts 560.203 and 560.204 (the

16   Iranian Transactions and Sanctions Regulations); all in violation of

17   Title 18, United States Code, Sections 554 and 2.

18

Count 7

19

CONSPIRACY TO LAUNDER MONETARY INSTRUMENTS

20     21.   Beginning at a date unknown to the grand jury and continuing

21   to on or about June 17, 2013, within the Southern District of

22   California, and elsewhere, defendants KOORUSH TAHERKHANI, aka Koorush

23   Taher Khani, TIG MARINE ENGINEERING SERVICES, ERGUN YILDIZ and ARASH

24   GHAHREMAN did knowingly combine, conspire, and agree with each other

25   and with other persons, known and unknown to the grand jury, to

26   transfer and transmit funds, to a place in the United States from and

27   through a place outside the United States with the intent to promote

28

27

the carrying on of specified unlawful activity, to wit, criminal violations of Title 50, United States Code, Sections 1702 and 1705 and Title 31, Code of Federal Regulations, Parts 560.203 and 560.204 (IEEPA and the Iranian Transactions and Sanctions Regulations) and Title 18, United States Code, Section 554 (smuggling goods from the United States); all in violation of Title 18, United States Code, Sections 1956(h) and 1956(a)(2)(A).

## Count 8

### LAUNDERING OF MONETARY INSTRUMENTS

22. On or about March 6, 2013, within the Southern District of California, and elsewhere,  defendants KOORUSH TAHERKHANI, aka Koorush Taher Khani, TIG MARINE ENGINEERING SERVICES, ERGUN YILDIZ and ARASH GHAHREMAN transmitted and transferred monetary instruments and funds, to wit, $18,000.00 in United States currency, to a place in the United States from and through a place outside the United States with the intent to promote the carrying on of specified unlawful activity, to wit, criminal violations of Title 50, United States Code, Sections 1702 and 1705 and Title 31, Code of Federal Regulations, Parts 560.203 and 560.204 (IEEPA and the Iranian Transactions and Sanctions Regulations) and Title 18, United States Code, Section 554 (smuggling goods from the United States); all in violation of Title 18, United States Code, Sections 1956(a)(2)(A) and 2.

//
//
//
//

28

1 | Count 9

## LAUNDERING OF MONETARY INSTRUMENTS

23. On or about June 17, 2013, within the Southern District of California, and elsewhere, defendants KOORUSH TAHERKHANI, aka Koorush Taher Khani, TIG MARINE ENGINEERING SERVICES, ERGUN YILDIZ and ARASH GHAHREMAN transmitted and transferred monetary instruments and funds, to wit, $32,590.00 in United States currency, to a place in the United States from and through a place outside the United States with the intent to promote the carrying on of specified unlawful activity, to wit, criminal violations of Title 50, United States Code, Sections 1702 and 1705 and Title 31, Code of Federal Regulations, Parts 560.203 and 560.204 (IEEPA and the Iranian Transactions and Sanctions Regulations) and Title 18, United States Code, Section 554 (smuggling goods from the United States); all in violation of Title 18, United States Code, Sections 1956(a)(2)(A) and 2.

## CRIMINAL FORFEITURE ALLEGATION 1

24. As a result of the commission of one or more of the felony offenses alleged in Counts 1 through 6 of this Indictment, in violation of Title 50, United States Code, Sections 1702 and 1705, Title 31, Code of Federal Regulations, Parts 560.203 and 560.204, Title 18, United States Code, and Sections 371 and 554, defendants KOORUSH TAHERKHANI, aka Koorush Taher Khani, TIG MARINE ENGINEERING SERVICES, ERGUN YILDIZ, and ARASH GHAHREMAN shall forfeit to the United States pursuant to Title 18, United States Code, Section 981(a)(1)(C), and Title 28, United States Code, Section 2461(c), any property, real and personal, which constitutes or is derived from proceeds traceable to the commission of the offenses

alleged in Counts 1 through 6 of this Indictment, including but not limited to a sum of money representing the proceeds obtained as a result of the offenses.

25. If any of the above-described forfeited property, as a result of any act or omission of a defendant,

      a.    cannot be located upon the exercise of due diligence;

      b.    has been transferred or sold to, or deposited with, a third person;

      c.    has been placed beyond the jurisdiction of the Court;

      d.    has been substantially diminished in value; or

      e.    has been commingled with other property which cannot be subdivided without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), made applicable herein by Title 28, United States Code, Section 2461(c), to seek forfeiture of any other property of said defendant up to the value of the said property described above as being subject to forfeiture.

## CRIMINAL FORFEITURE ALLEGATION 2

26. As a result of the commission of one or more of the felony offenses alleged in Counts 7 through 9 of this Indictment, defendants KOORUSH TAHERKHANI, aka Koorush Taher Khani, TIG MARINE ENGINEERING SERVICES, ERGUN YILDIZ, and ARASH GHAHREMAN shall forfeit to the United States, pursuant to Title 18, United States Code, Section 982(a)(1), any and all property, real and personal, involved in the charged offense, or any property traceable to the offense, including, but not limited to, approximately $60,555 in United States dollars.

//

30

27.    If    any    of    the    above-described    forfeited    property,    as    a
result of any act or omission of a defendant,

        a.    cannot be located upon the exercise of due diligence;

        b.    has been transferred or sold to, or deposited with, a
           third person;

        c.    has been placed beyond the jurisdiction of the Court;

        d.    has been substantially diminished in value; or

        e.    has been commingled with other property which cannot be
           subdivided without difficulty;

it is the intent of the United States, pursuant to Title 21, United
States Code, Section 853(p), made applicable herein by Title 28,
United States Code, Section 2461(c), to seek forfeiture of any other
property of said defendant up to the value of said property described
above as being subject to forfeiture.

All pursuant to Title 18, United States Code, Sections 981(a)(1)(C)
and 982(a)(1), and Title 28, United States Code, Section 2461(c).

    DATED:    November 22, 2013.

                                      A TRUE BILL:

                                      Foreperson

LAURA E. DUFFY
United States Attorney

By:    _____
    SHANE P. HARRIGAN
    Assistant U.S. Attorney